John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California  91103
Tel: (626) 449-8300

Erin Darling, State Bar No. 259724
erin@erindarlinglaw.com
LAW OFFICES OF ERIN DARLING
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California  90010
Tel: (323) 736-2230

Attorneys for Plaintiff Joseph LaRocca

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH LaROCCA,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT, CHIEF MICHEL MOORE, OFFICER MICHAEL ANGEL OTAMENDI, and DOES 2 TO 10,<br><br>    Defendants. | Case No.  2:22-cv-6948-SVW-PD<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  June 26, 2023<br>Time: 1:30 p.m. |

1

# Table of Contents

2    Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

3    Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

4    I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5    II.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6    III.    Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7    IV.    Genuine Issues Whether Otamendi's Shot Was Objectively Reasonable
         Preclude Summary Judgment On the Excessive-Force Claim. . . . . . . . . . . . . . 7
8
9         A.    The Fourth Amendment Is Violated When an
               Individual's Movement Is Terminated by an Intentional
10               Application of Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11         B.    Genuine Issue of Fact Preclude Summary Judgment
               On Whether  Otamendi's Shot Was Objectively Reasonable . . . . . . . . . 9

12               1.    Lighting Fireworks Was Not a Sufficient Threat To Fire
                     the 40mm, Especially With Plaintiff Standing In the Way . . . . . . . 9
13
               2.    By the Time Otamendi Fired, the Man On the Mound
14                     No Longer Posed A Threat, Having Launched the Firework . . . . 11

15    V.    Defendant Otamendi Is Not Entitled to Qualified Immunity  . . . . . . . . . . . . 12

16    VI.    Defendants Are Not Entitled to Summary Judgment On Plaintiff's *Monell* and
         Supervisory Liability Claims Against the City, the LAPD and Chief Moore . . . 14
17
18    VII.    Plaintiff Has Raised Triable Issues Under the California Bane Act . . . . . . . . . 18

19    VIII.    The Doctrine of "Transferred Intent" Precludes Summary
         Judgment on Plaintiff's Battery Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20    IX.    Genuine Issues Preclude Summary Judgment on Negligence . . . . . . . . . . . . . 19

21    X.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

22    Word Count Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

23

24

25

26

27

28

# Table of Authorities

**Cases**                                                                                        **Page(s)**

*Admiralty Fund v. Tabor,*
   677 F. 2d 1297 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Amnesty America v. Town of West Hartford,*
   361 F.3d 113 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Arruda ex rel. Arruda v. Cnty. of Los Angeles,*
   373 F. App'x 798 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Black Lives Matters Los Angeles v. City of Los Angeles,*
   No. CV 20-5027 CBM, 2021 WL 3163309 (C.D. Cal. May 10, 2021) . . . . . . . . 15

*Blankenhorn v. City of Orange,*
   485 F.3d 463 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Board of Cnty. Commissioners v. Brown,*
   520 U.S. 397 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Brendlin v. California,*
   551 U.S. 249 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Briley v. City of Hermosa Beach,*
   2008 U.S. Dist. LEXIS 87583 (C.D. Cal. Sept. 29, 2008) . . . . . . . . . . . . . . . . . 18

*Brower v. Cnty. of Inyo,* 489 U.S. 593 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Chaudhry v. City of Los Angeles,*
   751 F.3d 1096 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City of Canton v. Harris,*
   489 U.S. 378 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Clark v. Capital Credit & Collection Servs.,*
   460 F.3d 1162 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Cornell v. City and Cnty. of San Francisco,*
   225 Cal. App. 5th 766 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Focus Media, Inc. v. NBC,*
   378 F.3d 916 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Gillette v. Delmore,*
   979 F.2d 1342 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Graham v. Connor,*
   490 U.S. 386 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Henry v. Cnty. of Shasta,*
   132 F.3d 512, 519 (9th Cir. 1997), *as amended*, 137 F.3d 1372 (9th Cir. 1998) . . 14

*Hunter v. Cnty. of Sacramento,*
   652 F.3d 1225 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Table of Authorities (Continued)**

**Cases**                                                                                                                    **Page(s)**

*Long v. Cnty. of Los Angeles,*
    442 F.3d 1178 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,16

*Marroquin v Unidentified LAPD Officer,*
    No. 2:21-cv-07607-RGK, 2022 WL 18278405 (C. D. Cal. Dec. 15, 2022)   8,13,13

*Monell v. New York Dep't of Soc. Servs.,*
    436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,14,17

*Montemayor v. City of Los Angeles,*
    2023 U.S. Dist. LEXIS 55748 (C.D. Cal. Mar. 28, 2023) . . . . . . . . . . . . . . . . . 18

*Monzon v. City of Murrieta,*
    No. 2:17-cv-01361-RGK, 2019 U.S. Dist. LEXIS 42769
    (C.D. Cal. Jan. 9, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nelson v. Davis,*
    685 F.3d 867 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,9,10,18

*Oviatt v. Pearce,*
    954 F.2d 1470 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Reese v. Cnty. of Sacramento,*
    888 F.3d 1030 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Richards v. Cnty. of San Bernardino,*
    39 F.4th 562 (9th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Robinson v. York,*
    566 F.3d 817 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Rogers v. Jarrett,*
    63 F.4th 971(5th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Saman v. Robbins,*
    173 F.3d 1150 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sampson v. Cnty. of Los Angeles,*
    974 F.3d 1012 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Saucier v. Katz,*
    533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Scott v. Harris,*
    550 U.S. 372 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Scott v. Henrich,*
    39 F.3d 912 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Singer v. Marx,*
    144 Cal. App. 2d 637 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Table of Authorities (Continued)**

**Cases**   **Page(s)**

*Taylor v. List,*
   880 F. 2d 1040 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Trevino v. Gates,*
   99 F.3d 911 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Villanueva v. California,*
   986 F.3d 1158 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,18

*Vos v. City of Newport Beach,*
   892 F.3d 1024 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Workers Org. Network v. City of Los Angeles,*
   246 F.R.D. 621 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Other Authorities**

U.S. Const. amend IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,10,18,19

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,12

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation,*
   111 Cal. L. Rev. 201 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cal. Civ. Code § 52.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Cal. R. Prof. Conduct 3.3(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

# I.     Introduction

The City of Los Angeles and Los Angeles Police Department (LAPD) have a history of using so-called "less-lethal" munitions, also referred to as kinetic impact projectiles (KIPs), at public assemblies. While breaking up an impromptu punk-rock concert, Defendant LAPD Officer Michael Otamendi fired a 40-millimeter (40mm) projectile that missed its target, hitting Plaintiff Joseph "Joey" LaRocca in the head instead, causing a skull fracture and subdural hematoma. Although LaRocca largely recovered, he continues to suffer cognitive problems.

Plaintiff filed this 42 U.S.C. § 1983 claim for damages. Defendants now move for summary judgment. Because there are genuine issues regarding the reasonableness of Otamendi's actions, and the City and LAPD policies and practices, the motion should be denied in all its particulars.

After demonstrations in 2020, the Los Angeles City Council ordered an investigation and report by independent counsel Gerald Chaleff. He reported back in March 2021 that the LAPD's two-hour training on the 40mm was "insufficient" and "problematic." Mr. Chaleff recommended the LAPD "analyze the use of the 40mm less lethal weapon in situations with large crowds, or ones where people are standing close together, and whether the use of such a weapon should be limited in such situations to individuals well-trained and experienced, as was the LAPD policy until 2017."

On June 18, 2022, Plaintiff attended a concert under the Sixth Street Viaduct, a dirt patch in an industrial area east of downtown Los Angeles. There were an estimated 400 to 500 people in attendance. Some ignited fireworks and others sprayed graffiti, but Plaintiff did not violate any laws. He was there to enjoy the live music. Officer watched from a distance, and a helicopter circled. Eventually, multiple LAPD officers responded, and moved in to shut down the concert after about an hour-and-a-half of music. 95 seconds after the band stopped playing, and as people were dispersing, Otamendi shot LaRocca in the left forehead with a 40mm, lacerating his face and knocking him to the ground.

There was no justification for the shot, other than a man on a mound of dirt behind where LaRocca was standing launched a firework, but not toward the officers. That individual, whose identity is not known to Plaintiff or Defendants, was leaving the mound and no longer posing an immediate threat to anyone at the time Otamendi fired.

The shot violated LAPD policy. The 40mm can only be used when an officer reasonably believes someone is violently resisting arrest or posing an immediate threat of violence or physical harm. Otamendi did not report that he had shot someone, nor that the person Otamendi shot sustained a visible head injury and dropped to the ground in need of immediate medical attention. Instead, Otamendi pretended like he did nothing wrong, ignoring Plaintiff's serious medical needs. Advancing LAPD officers found LaRocca sprawled on the ground, disabled by the gaping head wound. Instead of telling LaRocca to lay still and summoning necessary medical attention to his location, however, Otamendi stood LaRocca up, and handed him off to another officer, who walked out of the area, where LaRocca ultimately had to fend for himself.

LaRocca drove home and, with the assistance of family, presented that evening at the Glendale Adventist emergency department, where he was ultimately diagnosed with a fractured skull and subdural hematoma. The next day, June 19, he was admitted to the Glendale Adventist acute-care hospital, where he remained until June 20. LaRocca has healed somewhat, but continues to suffer headaches, trouble with cognition and other neurological deficits. He has had multiple medical follow up visits and is still recovering. Some of the consequences, including neurological deficits, and a scar, appear to be permanent.

Defendants motion is premised solely on the fact that Otamendi was not aiming at LaRocca. Under binding Ninth Circuit precedent, as construed by other judges of this District, however, that does not change the outcome. For Fourth-Amendment purposes the fact that Otamendi intentionally fired with LaRocca standing directly in the line of fire is sufficient for liability under § 1983, *Monell*, and the state-law theories alleged. Accordingly, the motion should be denied.

- 2 -

**II.     Statement of Facts**

At 7:00 p.m. on June 18, 2022, the Dead City Punx announced on social media an impromptu concert in an open area located under the Sixth Street Viaduct near an industrial area east of downtown Los Angeles. Plaintiff Joseph "Joey" LaRocca, age 41, who had toured with his own punk-rock band from age 19 to 27 before settling down with his wife to raise their two children while pursuing a career in the entertainment industry, attended because he admired the band and was curious about the resurgence of interest in punk rock among the younger generation. LaRocca Decl., paras. 2-3.

The LAPD assigned Hollenbeck Division officers to observe as the crowd grew to 400 or 500. DEF 543-44.[1] An LAPD helicopter began circling the event at 8:11. DEF 544. The band was loud and people were dancing. Some, including LaRocca, drank beer. Fireworks were exploding. LaRocca Decl., para. 4.

The LAPD mustered backup. Defendant Officer Michael Otamendi, armed with a 40mm launcher, arrived at 9:17 with a Newton Division gang enforcement detail. The backup units staged to the north of the event. DEF 547. At around 9:25 the officers moved in to shut down the concert. Clark Decl., para. 9.

Videos show the Dead City Punx stopped playing at 9:26:40. At that point, Plaintiff had been enjoying the concert for about an hour-and-a-half, most of that time while police were watching. The police approach meant, "It's time to go." LaRocca Decl., paras. 5-6. As partygoers moved south, away from the officers, objects were thrown and more fireworks detonated. DEF 545. At 9:26:49 Otamendi, without warning, fired a 40mm at an unidentified person "after the male was seen throwing a rock at officers," with unknown results. DEF 548. About a minute later, at 9:27:40, when LaRocca, with hands raised, tried to leave to the north, though the skirmish line, away from individuals launching fireworks, Otamendi yelled "Get the fuck back!" Plaintiff's Video 1; LaRocca Decl., para. 7.

---

[1]Plaintiff files DEF 538-59, the Force Investigation Division (FID) Report under seal because Defendants produced it pursuant to the protective order entered as ECF 39.

LaRocca complied, moving away from the officers. He stood near a woman in shorts and boots who was video recording. He did not want to be near individuals lighting fireworks or being confrontational with the police. LaRocca Decl., para. 8.

An LAPD video shows a man on a mound, the woman in shorts to his front, and LaRocca standing behind her, but in front of the mound, right before the shooting.



Plaintiff's Video Exhibit 3.

At 9:28:08 Officer Garrett Van Hooser grabbed Otamendi by the belt and moved him several yards, pointing out someone throwing objects. Van Hooser Depo. at 61. At 9:28:11, the man on the mound launched a firework east, which exploded harmlessly near other concert goers at 9:28:13. DEF 550; Plaintiff's videos 2 and 3. The person Van Hooser pointed out was neither the person on the mound nor LaRocca. Van Hooser Depo. at 61. At 9:28:14, when a different officer pointed out the man on the mound, Otamendi fired the round that hit LaRocca. DEF 550.

The LAPD's FID report confirms that the man on the mound launched a firework before Plaintiff was shot: "At 2128:11 hours, from the suspect's outstretched arm, a firework was launched toward the west," DEF 550, and then "[a]t 2128:14 hours, Officer Otamendi fired his second round in a southerly direction at the suspect from an approximate distance of 50-60 feet." DEF 549. *See also*, Plaintiff's Video 3. Otamendi admits that he fired after the firework was launched: "He threw the firework and I launched a 40 millimeter and it detonated." Otamendi Depo., at 69:18-19.

The LAPD admits that Otamendi's "round inadvertently struck LaRocca in the forehead and he fell to the ground," DEF 549, although Otamendi will not concede he shot LaRocca, or even that he saw what happened. Otamendi Depo. at 52:13-14; 75:2-4. In any event, LaRocca stayed down, bleeding from the forehead. Minutes later, the officers advanced as remaining concert goers left. Instead of summoning medical, however, Otamendi stood LaRocca up. Officer Van Hooser walked LaRocca north, in the direction he had tried to leave minutes before. Plaintiff's Video 4.

LaRocca was instructed to seek aid from the ambulance. There was no ambulance. LaRocca had to drive to a gas station to clean himself up. He then drove home. His family immediately took him to the Glendale Adventist emergency room where he had ten stitches to close up the gash in his left forehead and a CT scan that showed a skull fracture and subdural hematoma. After two more CT scans, LaRocca was released on the evening of June 20, about 48 hours after the concert. Although the physical damage did not worsen, Plaintiff has experienced cognitive effects of this head trauma over the past year. LaRocca Decl., paras. 10-11.

Plaintiff's injury is not an isolated event. Defendants City and LAPD have a long, well documented history of permitting and encouraging the unconstitutional use of so-called "less-lethal" munitions, referred to as kinetic impact projectiles (KIPs), on people at public assemblies. Published more than a year before this incident, the "Independent Examination of the Los Angeles Police Department 2020 Protest Response" by Independent Counsel Gerald Chaleff reported to the City Council on the LAPD's use of 40mm rounds during the George Floyd demonstrations against police misconduct.[2] The Chaleff Report made several findings, including (1) the LAPD's directive authorizing the 40mm "has no detailed guidance on use in public order policing situations"; (2) deployment of less-lethal munitions was not always done at the direction of a supervisor, leaving officers to fire less-lethal weapons, including the

---

[2]Relevant excerpts from the Chaleff Report are attached as Exhibit C to the Declaration of Roger Clark.

40mm, with no direction or coordination; (3) certification to deploy the 40mm came
from a one-time training, but "deploying the 40mm in public order policing situations
requires recurring certification and training"; and (4) the two-hour training was
insufficient "given the skill level needed to deploy the 40mm in a chaotic public order
policing environment." Exhibit C (Chaleff Report) at 62-64.

Mr. Chaleff documented legal settlements to resolve lawsuits filed to address
alleged LAPD misconduct at large events, including the 2000 Democratic National
Convention, the 2007 May Day MacArthur Park demonstration, the 2011 Occupy LA
protests, and the 2014 Ferguson marches. Each Agreement included mandates that the
LAPD correct policy, procedures, and training regarding its management of crowds.
The Department did not meet all requirements, which in turn caused problems for the
Department in 2020. "Crowd control, mobile field force, mass arrest procedures and
less lethal training were all insufficient." Exhibit C (Chaleff Report) at 10.

### III.  Legal Standard

"Summary judgment is only appropriate if, viewing the evidence in the light most
favorable to the party opposing the motion, the court finds that there is no genuine
issue of material fact and the movant is entitled to judgment as a matter of law." *Taylor
v. List*, 880 F. 2d 1040, 1044 (9th Cir. 1989). All reasonable inferences must be drawn in
the light most favorable to the non-moving party and the motion may be granted only
where those inferences defeat the non-movant's claims. *See, e.g., Admiralty Fund v. Tabor*,
677 F. 2d 1297, 1298 (9th Cir. 1982). Conflicting accounts and credibility issues must be
be determined by a jury. *See Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162,
1172-73 (9th Cir. 2006). The same standard applies to summary adjudication of a single
claim or portion of a claim. *See, e.g., Focus Media, Inc. v. NBC*, 378 F.3d 916, 925 (9th Cir.
2004). The Court should examine all the evidence, including "any expert testimony
proffered by the plaintiff," here the Declaration of Police-Practices Expert Roger Clark,
to determine whether the official's story is internally consistent and consistent with
other known facts. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

**IV.    Genuine Issues Whether Otamendi's Shot Was Objectively Reasonable
Preclude Summary Judgment On the Excessive-Force Claim.**

    **A.    The Fourth Amendment Is Violated When an Individual's
Movement Is Terminated by an Intentional Application of Force.**

Defendants do not contend that shooting *Plaintiff* was reasonable under the circumstances. They agree he posed no threat. Instead, Defendants contend that because Otamendi intended to shoot a man who launched a firework, and did not intend to shoot LaRocca, there was no Fourth-Amendment seizure. That is not the law.

Defendants rely on a 2010 *unpublished* Ninth Circuit case, *Arruda ex rel. Arruda v. Cnty. of Los Angeles*, 373 F. App'x 798 (9th Cir. 2010), to assert a "well- established rule" that "unintended seizures do not constitute a legally cognizable or unlawful seizure under the Fourth Amendment." Defs.' Mot. at 8-9. Defendants do not address the subsequent *published* decision in *Nelson v. Davis*, 685 F.3d 867 (9th Cir. 2012), a case with similar facts to those presented here that came to the opposite conclusion.

In *Nelson*, a college student was shot in the eye by a pepperball during police efforts to break up a rowdy party. The district court granted summary judgment because Plaintiff "was not individually targeted, and therefore his shooting was unintentional and incapable of causing a Fourth Amendment violation." *Id.* at 876. The Ninth Circuit reversed because the "argument misapprehends the distinction between intentional and unintentional conduct that the Supreme Court has repeatedly held as determinative of the Fourth Amendment analysis." *Id.* "The intentionality requirement is satisfied when the 'termination of freedom of movement [occurs] *through means intentionally applied*." *Id.* (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)) (brackets and emphasis in original). "For an act to be unintentional, the governmental conduct must lack the element of volition; an absence of concern regarding the ultimate recipient of the government's use of force does not negate volition." *Id.*

While *Nelson* involved pepperballs designed to release gas near individuals, the same principle applies to target-specific projectiles such the 40mm. In *Villanueva v.*

1  *California*, 986 F.3d 1158 (9th Cir. 2021), officers asserted a car passenger was not seized

2  because they intended to shoot another occupant. The Ninth Circuit wrote: "The

3  Supreme Court 'ha[s] repeatedly rejected attempts to introduce this kind of subjectivity

4  into Fourth Amendment analysis," *Id.* at 1166 (quoting *Brendlin v. California*, 551 U.S.

5  249, 260 (2007)), explaining, "under *Brendlin*'s logic, it is irrelevant whether [the officers]

6  knew any passengers were in the car. . . . [The plaintiff] was subject to the Officers'

7  'intentional action to stop the car' . . . whether the Officers knew he was a passenger

8  when they fired or not." *Id.* at 1167 (quoting *Brendlin*, 551 U.S. at 260). *Villanueva*—like

9  *Nelson*—"rejected the officers' argument that because [the plaintiff] was not individually

10 the target of their use of force, his injury was unintentional and thus not in violation of

11 the Fourth Amendment. *Id.* at 1168.

12      In a case arising from indistinguishable facts—the only difference being the

13 LAPD were dispersing a raucous Laker victory celebration rather than a punk-rock

14 concert—Judge Klausner, relying on *Nelson* and *Villanueva*, denied Defendants' post-

15 trial Rule 50 and Rule 59 motions, in relevant part, stating:

16      Defendants continue to press a legal argument they have proffered

17      throughout this litigation—that if an officer's action is "negligent rather than

18      intentional," he cannot have violated a constitutional right, and indeed cannot

19      even have "seized" the person who was harmed. An officer need not

20      intentionally aim at a specific person to seize that person for Fourth

21      Amendment purposes. . . . So long as an individual's freedom of movement is

22      terminated by an "intentional application of force," that individual is seized.

23 *Marroquin v Unidentified LAPD Officer*, No. 2:21-cv-07607-RGK, 2022 WL 18278405, *4

24 (C. D. Cal. Dec. 15, 2022) (footnote omitted).[3]

25

26

27

28      [3]The same defense counsel represented Defendants in *Marroquin*, yet *Nelson*, *Villanueva* and *Marroquin* are not mentioned in the moving papers, suggesting a lack of candor despite duties imposed by the State Bar. *See* Cal. R. Prof. Conduct 3.3(a)(2).

Defendants paint a vivid picture of how some individuals misbehaved during the concert, insinuating that because he also attended LaRocca shares blame for getting shot. Defs.' Mot. at 5-6. The Ninth Circuit has explained, however, that "general disorder" and acts of third parties "cannot be used to legitimize the use of [ ] projectiles against non-threatening individuals." *Nelson*, 685 F.3d at 881. LaRocca posed no threat to anyone, and had tried to leave, only to be told by Otamendi to "get the fuck back!" LaRocca's conduct "neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson*, 685 F. 3d at 881.

**B.    Genuine Issue of Fact Preclude Summary Judgment On Whether Otamendi's Shot Was Objectively Reasonable.**

**1.    Lighting Fireworks Was Not a Sufficient Threat To Fire the 40mm, Especially With Plaintiff Standing In the Way.**

Otamendi acknowledges the LAPD standard: An officer may only fire the 40mm to control a suspect who is posing an *immediate* threat to the safety of the officer or others. Otamendi Depo. at 17-19. Defendants contend that the man on the mound behind Plaintiff posed such a threat by launching a firework. Plaintiff's expert disagrees. "A reasonably well trained officer would not fire at someone lighting a firework, a relatively minor threat, especially with people in the foreground who could be hit 'inadvertently.'" Clark Decl., para. 11.

The body-worn camera video recordings establish there are genuine issues of fact, as the jury could believe its own eyes and reject Otamendi's testimony that he "had a clear unobstructed view" when he shot at the man on the mound. Otamendi Depo. at 71:2-3; *see Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (where video recording contradicts party's version reviewing courts should reject "visible fiction"). A jury could reasonably conclude that Otamendi used excessive force when he fired in the direction of people video recording the officers, regardless of whether there was justification to shoot the man on the mound behind them. A reasonable officer would know firing a 40mm might lead to the serious injury of a non-threatening individual in the foreground.

Significantly, in the video that the LAPD posted on its Youtube channel,[4] Defendants illustrate how Plaintiff was standing near the woman in shorts, in front of the man on the mound, and therefore directly in Otamendi's line of fire. The image includes the LAPD's own arrows and descriptions:



Given the high degree of skill necessary to use the 40mm safely in a crowd control situation and Otamendi's lack of practice, Otamendi Depo. at 12:24-13:5 ("maybe less than 5 practice rounds" at 25 feet), a jury could find it unreasonable for Otamendi to fire intentionally while there were people standing in the foreground. Otamendi would have to agree. He testified, "If there is a person that is near the target, that means if it's that close, then you wouldn't shoot because you have your foreground or background or whatever that hypothetical is at." Otamendi Depo. at 26:10-13. That is Plaintiff's case. Because LaRocca was in the "foreground," "near the target," "you wouldn't shoot."

When officers' "conduct resulted in [a plaintiff] being hit by a projectile that they intentionally fired toward a group of which he was a member," according to the Ninth Circuit, "their conduct was intentional, it was aimed towards [plaintiff] and his group, and it resulted in the application of physical force to [plaintiff's] person as well as the termination of his movement. [Plaintiff] was therefore intentionally seized under the Fourth Amendment." *Nelson*, 685 F.3d at 877.

---

[4]See https://www.youtube.com/watch?v=EebTMAMGsbI&t=736s.

1    Accordingly, genuine issues preclude summary judgment on whether Otamendi

2    seized LaRocca by subjecting him to excessive force in violation of the Fourth

3    Amendment.

4    **2.    By the Time Otamendi Fired, the Man On the Mound No**

5    **Longer Posed A Threat, Having Launched the Firework.**

6    Body-worn video shows that Otamendi fired after the man on the mound

7    launched a small firework in a direction parallel to the police skirmish line. The man

8    turned to descend, disappearing behind the mound as he walked away from the police.

9    Three seconds later Plaintiff collapsed, having been hit by the 40mm. Thus, the jury

10    could conclude Otamendi fired too late to stop a threat from the man on the mound.

11    The timeline, as stated in the FID report (derived from the videos) is as follows:

12    "At 2128:11 hours, from the suspect's outstretched arm, a firework was launched

13    toward the west." DEF 550. (The officers were to the north.) Three seconds later, "at

14    2128:14 hours, Officer Otamendi fired his second round in a southerly direction at the

15    suspect from an approximate distance of 50-60 feet." DEF 549. "At 2128:14 hours,

16    LaRocca collapsed at the base of the dirt mound." DEF 550.

17    Defense expert Edward Flosi adopts the same timeline: "At approximately

18    21:28:11 hours, from the suspect's arm, a firework was launched toward the west." Flosi

19    Report at 15:2-3. "At approximately 21:28:14, LaRocca collapsed at the base of the dirt

20    mound and the suspect disappeared behind the dirt mound." *Id.* at 16:2-3.[5]

21    Otamendi acknowledges he fired after the firework was launched: "He threw the

22    firework and I launched a 40 millimeter and it detonated." Otamendi Depo. at 69:18-19.

23    A reasonable jury could determine that at the time Otamendi shot LaRocca there

24    was no threat from the man on the mound, and that any threat he had posed had

25    dissipated. Accordingly, the motion for summary judgment should be denied.

26

27

28

[5]Mr. Flosi's Report is in the record as an exhibit to Plaintiff's Opposition to
Defendants' Motion in Limine No. 5. ECF 70-2.

## V.    Defendant Otamendi Is Not Entitled to Qualified Immunity

The standards for assessing qualified immunity are well established, if not uniformly interpreted or universally accepted.[6] "Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Plaintiff addressed the first prong above. As to the second prong, the cases cited, particularly *Nelson v. Davis*, 685 F.3d 867 (9th Cir. 2012), and *Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021), clearly established the principal rule applicable here, that officers can be held liable for excessive force when needlessly or recklessly shooting a projectile at someone in a crowd and hitting a bystander.

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999). Thus, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

---

[6] The text of Section 1 of the Civil Rights Act of 1871 (now codified as § 1983) precludes qualified immunity. Research has established that this unwieldy, arbitrary and unfair judge-made doctrine rests on a scrivener's error made when compiling the federal code 150 years ago. Plaintiff recognizes this Court is not in position to overrule more than fifty years of Supreme Court precedent that is based on a mistake, but makes his objection to preserve a record for appeal. *See, e.g.*, *Rogers v. Jarrett*, 63 F.4th 971, 979-81 (5th Cir. 2023) (Willitt, J., concurring) (citing Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023) (reference to "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding" was included in Act passed by Congress and omitted from 1874 compilation).

As Judge Klausner wrote when denying qualified immunity in *Marroquin*:
The Ninth Circuit has clearly established that it is an excessive use of force
to fire a less-lethal projectile into a crowd, either at the crowd generally or
at an individual no longer posing a threat, where the projectile causes
serious injury. *See Nelson*, 685 F.3d at 886 ("[A] reasonable officer would
have been on notice that both the firing of a projectile that risked causing
serious harm, in the direction of non-threatening individuals who had
committed at most minor misdemeanors . . . would constitute
unreasonable force."); *Deorle v. Rutherford*, 272 F.3d 1272, 1285-86 (9th Cir.
2001) (holding that an officer used unreasonable force by firing, without
warning, a beanbag projectile at someone who was advancing on the
officer while holding a bottle); *see also Johnson v. City of San Jose*, 591 F.
Supp. 3d 649, 662-63 (N.D. Cal. 2022) (holding that defendant officer did
not have qualified immunity after shooting plaintiff in response to
unidentified member of a crowd throwing a water bottle).

    . . . . Resolving all factual disputes in Plaintiff's favor, the Court
finds that a reasonable officer would have known that it was a
constitutional violation to fire into a tightly-knit crowd (either
indiscriminately or at an individual who did not pose an imminent threat),
risking serious injury to whomever was struck.

*Marroquin*, *supra*, 2022 WL 18278405 at *5.

    Because the facts are controverted and "the state of the law at the time of
[Otamendi's] conduct gave [him] fair warning that [his] alleged conduct was
unconstitutional," *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1019 (9th Cir. 2020),
the motion seeking qualified immunity should be denied.

**VI.      Defendants Are Not Entitled to Summary Judgment On Plaintiff's *Monell* and Supervisory Liability Claims Against the City, the LAPD and Chief Moore.**

Plaintiff asserts claims pursuant to *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), based on the City's, the LAPD's and Chief Moore's policies, practices and customs allowing the use of the 40mm for crowd control without adequate policies or training. "[T]he unfortunate history of civil rights violations by LAPD officers" including "excessive force . . . against demonstrators" is no secret. *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 627-28 (C.D. Cal. 2007).

A widespread "custom or practice" must be so "persistent" that it constitutes a "permanent and well settled city policy" and "constitutes the standard operating procedure of the local governmental entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691); *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). "[A] custom or practice can be supported by evidence of repeated constitutional violations which went uninvestigated and for which the errant municipal officers went unpunished." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011). "Normally, the question of whether a policy or custom exists would be a jury question." *Trevino*, 99 F.3d at 920; *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1190-91 (9th Cir. 2006) ("Whether a local government has displayed a policy of indifference to the constitutional rights of its citizens is generally a jury question.")

There is considerable evidence that the City has been deliberately indifferent despite settlements and injunctions. When a municipality turns "a blind eye" to constitutional violations, "despite having received notice of such violations—a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference." *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *as amended*, 137 F.3d 1372 (9th Cir. 1998). A municipality's "failure even after being sued to correct a blatantly unconstitutional course of treatment is even more persuasive evidence of deliberate indifference or of a policy encouraging such official misconduct." *Id.* at 520.

The misuse of the 40mm for crowd control was so prevalent Judge Marshall took judicial notice of the Chaleff Report and enjoined the LAPD in *Black Lives Matters Los Angeles v. City of Los Angeles*, No. CV 20-5027 CBM(ASX), 2021 WL 3163309 (C.D. Cal. May 10, 2021). The injunction provided:

> • LAPD is restricted from using the 40mm . . . in public demonstrations except by officers who are properly trained and certified to use the less-lethal launchers;
>
> • LAPD must give a verbal warning to disperse consist with the LAPD use of force directive and a reasonable opportunity to comply before deploying a 40mm . . . , except when an officer is attacked;
>
> • The 40mm . . . may only be used on persons who pose a threat of serious bodily harm to others, including law enforcement;
>
> • The 40mm launcher must not be used to target the head, neck, face, eyes, or spine of a person; and
>
> • LAPD is restricted from aiming the launchers at the upper bodies of demonstrators.

*Black Lives Matter Los Angeles v. City of Los Angeles*, No. CV 20-5027 CBM, 2021 WL 3162706, at *4 (C.D. Cal. Apr. 19, 2021). Viewing the evidence here in the light most favorable to Plaintiff, a jury could find Defendants violated each provision of the preliminary injunction. Thus, a reasonable jury could find Defendants turn a blind eye to constitutional violations, even after being enjoined, and therefore can infer a longstanding practice of permitting improper use of 40mm munitions.

In the last year alone, at least two Central District of California courts denied summary judgment motions filed by the City of Los Angeles in cases alleging that the City tolerates a custom of LAPD's improper use of the 40mm in crowd-control situations. In addition to *Marroquin*, in *Montamayor v. City of Los Angeles*, 2:21-cv-3124-CBM (C.D. Cal. Mar. 28, 2023), Judge Marshall cited the Chaleff report, which itself noted past settlements, including the 2000 Democratic National Convention, the 2007 MacArthur Park incident, the 2011 Occupy LA litigation, and the

- 15 -

2014 Ferguson demonstration. In each "there were mandates that the Department correct policy, procedures, and training." *Id.* at 15. The Department did not fulfill all the requirements of these prior settlement agreements, which in turn caused more problems for the Department in the 2020 protests triggered by the death of George Floyd. "Crowd control, mobile field force, mass arrest procedures and less lethal training were all insufficient." Chaleff Report at 10.

A city's "lack of affirmative policies or procedures" to guide officers can constitute deliberate indifference. *Long*, 442 F.3d at 1189. Despite multiple lawsuits, the LAPD's Use of Force Tactics directive authorizing the use of the 40mm "has no detailed guidance on use in public order policing situations." Chaleff Report at 62-64. Moreover, in practice, deployment of less lethal munitions was not always done at the direction of a supervisor, and officers were left to deploy less lethal tools, including the 40mm, with no direction or coordination; certification to deploy the 40mm came from a one-time training, but "deploying the 40mm in public order policing situations requires recurring certification and training." *Id.*

To state a failure to train claim, a plaintiff must show "(1) he was deprived of a constitutional right, (2) the City had a training policy that 'amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely to come into contact, and (3) his constitutional injury would have been avoided had the City properly trained those officers." *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007).The Supreme Court has held that a municipality's failure to train its officers may result in municipal liability when the likelihood of violation of constitutional rights absent training is sufficiently high "that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). *Canton* has been extended to situations where a city's "policy of inaction" results in a constitutional violation, applying the same "deliberate indifference" standard. *See, e.g., Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir. 1992); *Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004).

- 16 -

A plaintiff can establish a failure to train claim where the "violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Board of Cnty. Commissioners v. Brown*, 520 U.S. 397, 407-08 (1997). "The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' right could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policy-makers' choice—namely, a violation of a specific constitutional or statutory right." *Id.* Even "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id.* at 409.

The Ninth Circuit makes clear that a law enforcement agency's failure to train its officers can support *Monell* liability regardless of whether there is a finding of liability on the part of individual officers. *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 574 (9th Cir. 2022). Here, as in *Richards*, the failure to train officers—for example Otamendi on the proper use of the 40mm launcher—can independently support a *Monell* claim, regardless of the individual liability of Otamendi himself.

The Chaleff Report concluded that the two-hour training given to officers such as Otamendi was insufficient "given the skill level needed to deploy the 40mm in a chaotic public order policing environment." Chaleff Report at 62-64. At his deposition, when asked how many practice shots he had taken with the 40mm, Otamendi testified, "maybe less than 5" at a target 25 feet away. Otamendi Depo. at 12:24-13:5. The LAPD gave Otamendi a 40mm, which he fired at someone in a crowd at "the approximate distance of 50-60 feet." DEF 549. Such a failure to train by providing for a sufficient number of practice rounds at appropriate distances is made more dangerous by the City having furnished Officer Otamendi with a weapon that missed the target at 75 feet.

Accordingly, the motion for summary judgment as to the *Monell* and supervisory claims should be denied.

**VII.   Plaintiff Has Raised Triable Issues Under the California Bane Act.**

In *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014), the Ninth Circuit held that "the elements of the excessive force claim under § 52.1 are the same as under § 1983," rejecting the argument proffered by defendants that the Bane Act, Civ. Code § 52.1, requires a coercive act distinct from the constitutional deprivation. In *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018), however, the Ninth Circuit held that the Bane Act does not require the "threat, intimidation, or coercion" element of the claim to be transactionally independent from the constitutional violation. *Id.* (quoting *Cornell v. City and Cnty. of San Francisco*, 225 Cal. App. 5th 766 (2017)).

Defendants cannot hang their hat on the argument that Officer Otamendi did not have the specific intent to violate Plaintiff's rights under § 52.1. As the Fourth Amendment analysis shows, under *Nelson* and *Villanueva*, the intent analysis applies to the use of force, not the particular target of the force.

**VIII.  The Doctrine of "Transferred Intent" Precludes Summary Judgment on Plaintiff's Battery Claim.**

Generally, "claims for assault and battery against peace officers should be resolved under the same liability standard as 42 U.S.C. § 1983 excessive force causes of action." *Montemayor v. City of Los Angeles*, 2023 U.S. Dist. LEXIS 55748, at *35 (C.D. Cal. Mar. 28, 2023 (citing *Saman v. Robbins*, 173 F.3d 1150, 1157 n. 6 (9th Cir. 1999)); *Briley v. City of Hermosa Beach*, 2008 U.S. Dist. LEXIS 87583, at *9-10 (C.D. Cal. Sept. 29, 2008).

Defendants' argument that Otamendi did not intentionally touch LaRocca and therefore did not batter him is wrong as a matter of state law. "If defendant unlawfully aims at one person and hits another he is guilty of assault and battery on the party he hit, the injury being the natural and probable consequence of the wrongful act.' The rule is not confined to criminal cases." *Singer v. Marx*, 144 Cal. App. 2d 637, 642 (1956). The form instruction states where a defendant "intended to commit a battery or assault on one person, but by mistake or accident committed the act on [Plaintiff], the battery or assault is the same as if the intended person had been the victim." CACI No. 1321.

Officer Otamendi unlawfully tried to shoot the man on the mound. Any threat he posed was insignificant. There is no evidence that a firework injured any of the hundreds of people present, both attendees and officers. The shot was not safe because there were people in the line of fire. Regardless, because the man on the mound had already released fireworks at the time Otamendi fired the 40mm, any threat had dissipated, and shooting the man on the mound would have been a battery, triggering the doctrine of transferred intent.

Therefore, triable issues preclude summary judgment on whether any threat had dissipated and whether it was unlawful for Otamendi to fire the 40mm at the man on the mound in the first place.

## IX.    Genuine Issues Preclude Summary Judgment on Negligence.

California negligence law is broader than federal Fourth-Amendment law. While the Fourth-Amendment analysis tends to focus more narrowly on the moment when force is used, state law considers the totality of the circumstances surrounding any use of force. *See, e.g., Monzon v. City of Murrieta*, No. 2:17-cv-01361-RGK, 2019 U.S. Dist. LEXIS 42769, at *25 (C.D. Cal. Jan. 9, 2019). To determine police liability under state law negligence, a court applies the "reasonable care" standard, which is distinct from the Fourth Amendment's "objective reasonableness" standard. "The Fourth Amendment is narrower and 'places less emphasis on preshooting conduct.'" *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018).

Nevertheless, California negligence law incorporates the factors articulated in *Graham v. Connor*, 490 U.S. 386 (1990), including: (a) whether the man on the mound appeared to pose an immediate threat to the safety of others; (b) the seriousness of the crime at issue; and (c) whether he was actively resisting. Here, the man on the mound did not pose an immediate threat, as he had already launched the firework by the time Otamendi fired. The seriousness of the crime of detonating fireworks did not justify Otamendi shooting the 40mm at a group of people. Also, defendants do not allege that anyone was resisting at the time Otamendi fired the 40mm. Given the totality of these

circumstances, and the people standing in front of the man of the mound, it was

unreasonable for Otamendi to apply such a violent use of force.

Defendants argue that Otamendi did not breach any duty because there is no

evidence that he was unreasonable under the  circumstances. Plaintiff contends a jury

should make that determination. Accordingly, the motion should be denied.

**X.    Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment should be

denied.

Respectfully submitted,

Dated:    June 5, 2023                              THE LAW OFFICES OF JOHN BURTON
                                                    LAW OFFICE OF ERIN DARLING


                                                                /S/ Erin Darling
                                        By:    _____
                                                              Erin Darling
                                                        Attorneys for Plaintiff

**Word Count Certification**

The undersigned, counsel of record for Plaintiff certifies that this brief contains 6,564 words, which complies with the word limit of L.R. 11-6.1.

Dated: June 5, 2023

THE LAW OFFICES OF JOHN BURTON
LAW OFFICE OF ERIN DARLING

By: _____/S/ Erin Darling_____
Erin Darling
Attorneys for Plaintiff